## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

SYLVIA KUGELMAN, individually and on
behalf of all others similarly situated,

Plaintiff,

v.

PVF CAPITAL CORP., STEVEN A.
CALABRESE, FREDERICK D. DISANTO,
UMBERTO P. FEDELI, MARK D. GROSSI,
RICHARD R. HOLLINGTON, III, ROBERT J.
KING, JR., STUART D. NEIDUS, and F.N.B.
CORPORATION,

Defendants.

Civil Action No. _____

**Jury Demand Included**

## CLASS ACTION COMPLAINT

Plaintiff Sylvia Kugelman ("Plaintiff"), by her attorneys, alleges upon information and

belief, except for her own acts, which are alleged on personal knowledge, as follows:

## NATURE OF THE CASE

1.      This putative class action arises out of the proposed merger (the "Merger")

between PVF Capital Corp. ("PVF Capital" or the "Company"), the Solon, Ohio-based parent

and holding company of Park View Federal Savings Bank ("Park View Federal"), and F.N.B.

Corporation ("FNB"), pursuant to which FNB, plans to acquire all of the outstanding shares of

PVF Capital in an all-stock transaction worth approximately $106 million.

2.      Under the terms of the parties' Agreement and Plan of Merger (the "Merger

Agreement"), executed on February 19, 2013, PVF Capital shareholders will receive 0.3405

shares of FNB stock for each of their shares of Company common stock. Based on FNB's

average stock price from the 20-day period leading up to the execution of the Merger Agreement, the Merger is worth approximately $3.97 per share to PVF Capital's shareholders.

3.     As alleged herein, the members of PVF Capital's board of directors (the "Board or the "Director Defendants") have violated the federal securities laws and breached their state law fiduciary duties to PVF Capital's shareholders by misrepresenting or omitting material information in proxy solicitation materials filed with the U.S. Securities and Exchange Commission (the "SEC").

4.     On June 28, 2013, FNB filed a Form S-4 Registration Statement , which also serves as PVF Capital's preliminary proxy statement (the "Proxy Statement"). Notwithstanding the Board's statutory obligation and fiduciary duty to disclose any and all material information to shareholders concerning the Merger, the Proxy Statement misrepresents and omits material information that PVF Capital's shareholders need in order to make a fully informed decision whether to vote for or against the Merger.

5.     Specifically, Defendants failed to disclose key information regarding (a) PVF Capital's long-term prospects, (b) the financial analyses supporting the Merger consideration performed by Sandler O'Neill + Partners, L.P. ("Sandler O'Neill"), the Board's financial advisor, (c) information concerning the process leading up to the announcement of the proposed Merger, and (d) conflicts of interest affecting both the Board and Sandler O'Neill.

6.     Without this information, PVF Capital shareholders will be unable to make a fully informed decision whether to vote for (or against) the proposed Merger. And as a result of an uninformed vote—which impinges on the foundational corporate principle of shareholder suffrage—the Company's shareholders stand to suffer irreparable harm.

7.      PVF Capital's Board members have also breached their fiduciary duties of loyalty and care to the Company's shareholders. Indeed, the Director Defendants were conflicted and seriously uninformed when they decided to enter into the proposed Merger with FNB.

8.      The Director Defendants acknowledged the need to solicit indications of interest from other parties in order to be able to assess the value of the Company. Moreover, the Proxy Statement plainly states that another party referred to as "Bank B" submitted a higher offer for the Company.

9.      Nonetheless, the Board sanctioned a process whereby a minimal number of parties were contacted about a potential transaction, and then the Board decided to accept FNB's lower offer presumably because of the post-Merger benefits offered to the Director Defendants and other members of the Company's management.

10.     Accordingly, Plaintiff, on behalf of herself and all other similarly situated PVF Capital shareholders, seeks to enjoin the proposed Merger unless and until Defendants remedy their violations.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder and Section 20(a) of the Exchange Act. This Court has supplemental jurisdiction over the Ohio state law claims asserted herein pursuant to 28 U.S.C. § 1367. This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.

12.     Venue is proper in this district because: (i) the conduct at issue took place and had an effect in this district; (ii) PVF maintains its principal place of business in this District; (iii) one or more of the defendants either resides in or maintains executive offices in this District; (iv) a

substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein occurred in this District; and (v) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

### PARTIES

13.     Plaintiff is, and has been at all relevant times, the owner of shares of PVF Capital common stock.

14.     Defendant PVF Capital is a financial services company incorporated in Ohio and headquartered at 3000 Aurora Road, Solon, Ohio. It is the parent and holding company for Park View Federal, a full-service bank that operates 16 locations located throughout the Greater Cleveland area. PVF Capital's common shares trade on the NASDAQ Capital Market under "PVFC."

15.     Defendant Steven A. Calabrese has served as a director of PVF Capital and Park View Federal since October 2008. He is a member of the Board's Compensation Committee and the Corporate Governance and Nominating Committee. During the past five years, Mr. Calabrese served as a director of Energy, Inc. and the John D. Oil and Gas Company.

16.     Defendant Frederick D. DiSanto has served as a director of PVF Capital and Park View Federal since July 2010. He is also a member of the Board's Compensation Committee. Mr. DiSanto served as Executive Vice President and Manager of Fifth Third Bank's Investment Advisors Division from 2000 to 2006, overseeing investment management, private banking, trust and banking services. Mr. DiSanto also currently sits on the board of, among others, John Carroll University.

17.     Defendant Umberto P. Fedeli has served as a director of PVF Capital and Park View Federal since November 2008. He is a member of the Board's Corporate Governance and

Nominating Committee. Along with Mr. DiSanto, Mr. Fedeli also serves on the board of John Carroll University.

18.     Defendant Mark D. Grossi has been Chairman of the Board of PVF Capital and Park View Federal since January 2009. He is also a member of the Board's Audit Committee. During the past five years, Mr. Grossi served alongside Mr. Calabrese as a director of Energy, Inc. and the John D. Oil and Gas Company.

19.     Defendant Richard R. Hollington, III has been a director of PVF Capital and also of Park View Federal since September 2009. He is also a member of the Board's Audit Committee, Compensation Committee, and Corporate Governance and Nominating Committee.

20.     Defendant Robert J. King, Jr. has served as a director, President, and CEO of both PVF Capital and Park View Federal since September 2009. Mr. King has previously held numerous positions with Fifth Third Bank, including alongside Mr. DiSanto.

21.     Defendant Stuart D. Neidus has served as a director of PVF Capital and Park View Federal since 1996. He is a member of the Board's Audit Committee.

22.     Defendant FNB is a diversified financial services company that is incorporated in Florida and headquartered in Pennsylvania. Through its main operating subsidiary, First National Bank of Pennsylvania ("First National Bank"), FNB has total assets of $12.4 billion and operates in six states and three major metropolitan areas, including Pittsburgh, Baltimore, and Cleveland.

23.     The persons listed in paragraphs 14 through 22 are collectively referred to as "Defendants."

## CLASS ACTION ALLEGATIONS

24.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all owners of PVF Capital common stock, excluding Defendants and their affiliates, immediate families, legal representatives, heirs, successors or

assigns and any entity in which Defendants have or had a controlling interest (the "Class"). This action is properly maintainable as a class action for the reasons set forth herein.

25.     The Class is so numerous that joinder of all members is impracticable. As represented in the parties' Merger Agreement, as of January 31, 2013, PVF Capital had 25,974,214 shares of common stock issued and outstanding.

26.     Questions of law and fact are common to the Class, including:

(a)     Whether Defendants have misrepresented or omitted material information concerning the Merger in the Proxy Statement in violation of the federal securities laws and the Director Defendants' state law fiduciary duties;

(b)     Did the Board members breach their fiduciary duties with respect to the Merger;

(c)     Did the Board act unreasonably and on a conflicted or uninformed basis when considering the Merger and other strategic alternatives; and

(d)     Is the Class entitled to injunctive relief or damages as a result of Defendants' wrongful conduct.

27.     Plaintiff's claims are typical of those of the other members of the Class, and Plaintiff is not subject to any atypical defenses.

28.     Plaintiff is an adequate representative of the Class—she is committed to prosecuting this action, has no interests that are adverse to the Class, and has retained competent counsel experienced in litigation of this nature.

29.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants, or adjudications that would, as a practical matter, be

dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

30.     Defendants have acted on grounds generally applicable to the Class, making appropriate final injunctive relief with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

### *Overview of PVF Capital and Its Poise for Growth*

31.     PVF Capital Corp. is a bank holding company that is headquartered and incorporated in Ohio.

32.     The business of PVF Capital consists primarily of the business of Park View Federal, which was founded as an Ohio chartered savings and loan association in 1920.

33.     PVF Capital also owns and operates PVF Service Corporation and Mid Pines Land Company, both of which are real estate subsidiaries, PVF Holdings, Inc., a financial services subsidiary which is currently inactive, and two other subsidiaries, PVF Mortgage Corp. and PVF Community Development Corp., both of which are chartered for future operation but are also currently inactive. PVF Capital also created PVF Capital Trust I and PVF Capital Trust II for the sole purpose of issuing trust preferred securities.

34.     Park View Federal's principal business consists of attracting deposits from the general public and investing these funds primarily in loans secured by first mortgages on real estate, as well as other commercial and consumer loans located in the Bank's market area, which consists of Portage, Lake, Geauga, Cuyahoga, Summit, Medina, and Lorain Counties in Ohio.

35.     Historically, Park View Federal has emphasized the origination of loans for the purchase or construction of residential real estate, commercial real estate and multi-family residential property and land loans.

36. To a lesser extent, Park View Federal has also originated loans secured by second mortgages, including home equity lines of credit and loans secured by savings deposits. Over the past few years, portfolio real estate lending has been minimal as Park View Federal has continued to focus on problem asset resolution.

37. Recently, the Bank has increased its lending activity in the commercial and industrial loan segment, including Small Business Administration ("SBA") lending, which it initiated in late fiscal 2011.

38. Park View Federal derives its income principally from interest earned on loans and, to a lesser extent, loan servicing and other fees, gains on the sale of loans and interest earned on investments. Park View Federal's principal expenses are interest expense on deposits and borrowings and non-interest expense such as compensation and employee benefits, office occupancy expenses and other miscellaneous expenses.

39. Funds for these activities are provided principally by deposits, Federal Home Loan Bank of Cincinnati advances and other borrowings, repayments of outstanding loans, sales of loans and operating revenues.

40. On October 19, 2009, PVF Capital and Park View Federal entered into two consent orders—the "Company Order" and the "Bank Order"—with the Office of Thrift Supervision (the "OTS"), the government entity that used to regulate certain financial institutions, including PVF Capital.

41. These orders were entered into because of alleged bad practices at PVF Capital and Park View Federal tied to the financial crisis.

42. Effective July 21, 2011, the Office of the Comptroller of the Currency (the "OCC") and the Federal Reserve Board succeeded to all powers, authorities, rights and duties of

the OTS relating to the Bank and Company Orders, respectively, as a result of the Dodd-Frank Act.

43.    The Bank Order required Park View Federal to take several actions, including but not limited to: (i) by December 31, 2009, meet and maintain (1) a Tier 1 (core) capital ratio of at least 8.0% and (2) a total risk-based capital ratio of at least 12.0% after the funding of an adequate allowance for loan and lease losses and submit a detailed plan to accomplish this; (ii) if Park View Federal fails to meet these capital requirements at any time after December 31, 2009, within 15 days thereafter prepare a written contingency plan detailing actions to be taken, with specific time frames, providing for (a) a merger with another federally insured depository institution or holding company thereof, or (b) voluntary liquidation; (iii) adopt revisions to Park View Federal's liquidity policy to, among other things, increase the Bank's minimum liquidity ratio; (iv) reduce the level of adversely classified assets to no more than 50% of core capital plus allowance for loan and lease losses by December 31, 2010 and to reduce the level of adversely classified assets and assets designated as special mention to no more than 65% of core capital plus allowance for loan and lease losses by December 31, 2010; (v) submit for OCC approval a new business plan that will include the requirements contained in the Bank Order and that also will include well supported and realistic strategies to achieve consistent profitability by September 30, 2010; (vi) restrict quarterly asset growth to an amount not to exceed net interest credited on deposit liabilities until the OCC approves of the new business plan; (vii) cease to accept, renew or roll over any brokered deposit or act as a deposit broker, without the prior written waiver of the FDIC; and (viii) not declare or pay dividends or make any other capital distributions from Park View Federal without receiving prior OCC approval.

44. The Company Order required PVF Capital to take several actions, including, but not limited to: (i) submit a capital plan that includes, among other things, (1) the establishment of a minimum tangible capital ratio of tangible equity capital to total tangible assets commensurate with PVF Capital's consolidated risk profile, and (2) specific plans to reduce the risks to the Company from its current debt levels and debt servicing requirements; (ii) not declare, make or pay any cash dividends or other capital distributions or purchase, repurchase or redeem or commit to purchase, repurchase or redeem PVF Capital equity stock without the prior non-objection of the OTS (and subsequently the OCC), except that this provision does not apply to immaterial capital stock redemptions that arise in the normal course of PVF Capital's business in connection with its share-based compensation plans; and (iii) not incur, issue, renew, roll over or increase any debt or commit to do so without the prior non-objection of the OTS (or the OCC) (debt includes loans, bonds, cumulative preferred stock, hybrid capital instruments such as subordinated debt or trust preferred securities, and guarantees of debt).

45. The Bank Order and the Company Order also imposed certain on-going reporting obligations and additional restrictions on severance and indemnification payments, changes in directors and management, employment agreements and compensation arrangements that PVF Capital and Park View Federal may enter into, third party service contracts and transactions with affiliates.

46. On August 27, 2012, the Bank was released from the Bank Order. On December 15, 2012, the Company was released from the Company Order.

47. Since PVF Capital emerged from the Bank and Company Orders, the Company's growth prospects have ballooned.

48. As Defendant King commented after the Bank Order was terminated:

> The OCC's removal of the regulatory order is a significant milestone and a major step forward for Park View. We continue to strengthen our position for long-term growth and profitability, and we have seen steady improvement in earnings and asset quality. We have broadened our product offerings, added resources to our commercial banking and small-business lending teams, and will continue to focus on our transformation strategy to deliver sustained profitability as a strong community bank.

### *The Proposed Merger Between PVF Capital and FNB*

49.     In a press release dated February 19, 2013, PVF Capital and FNB announced that they had entered into the Merger Agreement, pursuant to which FNB has agreed to acquire all of the outstanding shares of PVF Capital in an all-stock transaction worth approximately $106 million.

50.     Under the terms of the parties' Merger Agreement, executed on February 19, 2013, PVF Capital shareholders will receive 0.3405 shares of FNB stock for each of their shares of Company common stock.

51.     Based on FNB's average stock price from the 20-day period leading up to the execution of the Merger Agreement, the Merger is worth approximately $3.97 per share to PVF Capital's shareholders.

52.     The Merger is contingent upon, among other things, the approval of a majority of the outstanding shares of PVF Capital's common stock.

53.     Following the consummation of the Merger, PVF Capital's shareholders will own roughly 6% of the combined entity.

54.     PVF Capital shareholders do not have "appraisal rights" in connection with the Merger that would allow them to obtain "fair value" for their shares.

55.     In connection with the process leading up to the execution of the Merger Agreement, PVF Capital's Board retained Sandler O'Neill to act as its financial advisor.

56.     The Merger is expected to close in October of 2013.

***The Proposed Merger Resulted from a Deficient and Conflicted Process***

57.     Whenever a company's board of directors decides to sell a company, the board has a fiduciary duty to act reasonably, free of conflict, and on an informed basis. Indeed, as trustees for the Company's shareholders, the Director Defendants should have taken reasonable steps to maximize shareholder value.

58.     Here, however, the Board oversaw a seriously flawed sales process that was tainted with self-interest and otherwise failed to maximize shareholder value.

59.      In July of 2012, the Board decided that, in considering a potential sale of the Company, it would be important to solicit other indications of interest to assess the value of PVF Capital, thus acknowledging the relevance of the competitive bidding process.

60.     To inform itself as to PVF Capital's value based upon a market-based assessment, the Board instructed Sandler O'Neill to contact FNB and no other party based on a previous relationship between PVF Capital and FNB.

61.     For the next several months, the Company engaged in exclusive negotiations with FNB and provided FNB with access to non-public, confidential information notwithstanding that FNB had not yet even submitted an offer to acquire PVF Capital.

62.     In October 2012, FNB indicated to Defendant King that it could not appropriately value the Company because of purported lack of financial records regarding PVF Capital's loan portfolios.

63.     Over the next two months, PVF Capital retained an undisclosed company to assist in reviewing financial statements and updating credit reviews on all loan files.

64.     In November 2012, the Board asked Defendant King to contact FNB to see if it was still interested in a potential deal.

65.     In December 2012, Bank B contacted Defendant King and expressed an unsolicited indication of interest to acquire PVF Capital.

66.     The Board subsequently decided to allow Bank B to conduct due diligence and provided FNB with additional due diligence.

67.     In late January, Bank B submitted an indication of interest worth $4.00 per share, and FNB submitted an indication of interest worth $3.65 per share. Both of these indications of interest contemplated all-stock transactions.

68.     Notwithstanding that the Board had ostensibly entertained the possibility of a transaction with Bank B, the Board decided to eschew Bank B's interest and proceed to negotiate a transaction with FNB.

69.     The Board, moreover, did this before conducting any due diligence on FNB or its short- or long-term prospects.

70.     The Board, acting through Sandler O'Neill, initially secured a modest price increase from FNB (to an exchange ratio of 0.3427), but FNB subsequently reduced its indication of interest to the eventually agreed-upon exchange ratio of 0.3405 because of alleged D&O insurance tail coverage issues. Specifically, the Board sought insurance coverage to protect them against any potential liability they might face for many years after the consummation of the Merger, yet such coverage was more expensive to obtain than FNB initially expected.

71.     The Board, obviously self-interested in maximizing D&O insurance tail coverage, accepted FNB's reduced offer and instructed its advisors to prepare definitive documentation.

72.    The Board did not contact Bank B after FNB lowered its offer to the eventual 0.3405 exchange ratio.

73.    The Director Defendants acted unreasonably in consciously disregarding Bank B's superior offer, choosing to enter into an agreement with FNB prior to conducting any due diligence on FNB, putting their own interests in maximizing insurance coverage ahead of shareholders' interests in securing the highest price possible, and failing to reengage Bank B after FNB lowered its bid.

### *The Anti-Competitive Deal Protection Devices*

74.    As part of the Merger Agreement, Defendants also agreed to certain onerous and preclusive deal protection devices that operate conjunctively to make the Merger a *fait accompli* and ensure that no competing offers will emerge for the Company.

75.    The Merger Agreement includes a "no solicitation" provision barring the Company from soliciting interest from other potential acquirers in order to procure a price in excess of the amount offered by FNB. This section also demands that the Company terminate any and all prior or on-going discussions with other potential acquirers.

76.    Pursuant to the Merger Agreement, should an unsolicited bidder submit a competing proposal, the Company must notify FNB of the bidder's identity and the terms of the bidder's offer.

77.    Thereafter, should the Board determine that the unsolicited offer is superior, before the Company can terminate the Merger Agreement with FNB in order to enter into the competing proposal, it must grant FNB five business days and allow FNB to amend the terms of the Merger Agreement to make a counter-offer that the Board must consider in determining whether the competing offer still constitutes a superior proposal.

78. In other words, the Merger Agreement gives FNB access to any rival bidder's information and allows FNB a free right to top any superior offer simply by matching it. Accordingly, no rival bidder is likely to emerge and act as a stalking horse, because the Merger Agreement unfairly assures that any "auction" will favor FNB and piggy-back upon the due diligence of the foreclosed second bidder.

79. In addition, the Merger Agreement provides that a termination fee of $4 million must be paid to FNB by PVF Capital if the Company decides to pursue the competing offer, thereby essentially requiring that the competing bidder agree to pay a naked premium for the right to provide the shareholders with a superior offer.

80. By contrast, the Merger Agreement contains no "reverse termination fee" that FNB would have to pay if it terminates the Merger Agreement.

81. The Merger Agreement also contains disparate options for FNB and PVF Capital to terminate the Merger Agreement. For example, FNB can terminate the Merger Agreement for a variety of reasons any time up to the PVF Capital shareholder vote on the Merger, whereas PVF Capital can terminate only before it distributes the definitive version of the Proxy Statement.

82. The Merger Agreement also contains a "force the vote" provision whereby, even if the Director Defendants receive and wish to accept a superior proposal, they must nonetheless hold a vote on the Merger with FNB.

83. Ultimately, the preclusive deal protection provisions that the Board agreed to illegally restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The circumstances under which the Board may respond to an unsolicited written bona fide proposal for an

alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

### *The Proxy Statement Misrepresents and Omits Material Information Concerning the Merger*

84.    On June 28, 2013, FNB filed the Form S-4 Registration Statement, which also serves as PVF Capital's preliminary Proxy Statement.

85.    Notwithstanding the fiduciary duty to disclose any and all material information concerning the Merger—which is necessary for the Company's shareholders to be able to cast an informed vote at the upcoming special meeting—Defendants failed to disclose key information regarding (a) PVF Capital's long-term prospects, (b) the financial analyses supporting the Merger consideration performed by Sandler O'Neill, the Board's financial advisor, (c) conflicts of interest affecting both the Board and Sandler O'Neill, and (d) information concerning the process leading up to the announcement of the proposed Merger.

#### *PVF Capital's Financial Forecasts*

86.    Financial forecasts (sometimes referred to as projections) are among the most important information to be disclosed to shareholders, particularly where, as here, they are asked to consider whether to share in the continued upside of a company versus foregoing future returns and accepting a miniscule percentage of another company.

87.    Moreover, Sandler O'Neill used PVF Capital's financial forecasts for the years ending December 31, 2013 through December 31, 2016 in performing its *Discounted Cash Flow Analysis*, the only financial analysis that yielded an implied per share value for the Company.

88.    Furthermore, among other things, the Board cited PVF Capital's financial prospects as one of the reasons it decided to enter into the Merger Agreement.

89.     Notwithstanding the materiality of these financial forecasts, the Proxy Statement fails to disclose any projected financial information for PVF Capital, including projected EBITDA, revenues, profits, expenses, etc., as well as how, if at all, the termination of the Bank Order and Company Order affected PVF Capital's long-term financial prospects. This constitutes a material omission.

90.     These projections were relied upon by Sandler O'Neill in performing its analyses and is material because it will assist PVF Capital's stockholders, who are being asked to part with their investment in PVF Capital, in making an informed decision in light of PVF Capital's future.

### *Sandler O'Neill's Financial Analyses*

91.     Sandler O'Neill, acting as the Board's financial advisor, performed various financial analyses in support of its so-called "fairness opinion" concerning the adequacy of the Merger consideration being offered to PVF Capital shareholders.

92.     The Board, in turn, expressly cited Sandler O'Neill's purported fairness opinion, which was based on its financial calculations, as one of the reasons supporting its decision to enter into the Merger Agreement.

93.     Shareholders are entitled to a fair summary of the analyses underlying an advisor's fairness opinion. However, the Proxy Statement inadequately discloses the underlying methodologies, key inputs, and multiples relied upon and observed by Sandler O'Neill, thereby preventing PVF Capital's shareholders from adequately and on an informed basis evaluating and understanding Sandler O'Neill's financial analyses and, thus, the resulting fairness opinion.

94.     With respect to Sandler O'Neill's "Comparable Company Analysis" for PVF Capital and FNB, the Registration Statement is deficient and should disclose the following:

(a) The bases for the divergent criteria for selecting the two sets of companies that are purportedly "comparable" to PVF Capital and FNB;

(b) The criteria for determining what analyses to perform in connection with the Comparable Group Analysis, including why Sandler O'Neill's analyses did not include *any* calculations relating to the Merger itself and, instead, included only a series of non-Merger related information;

(c) The definition of "price" as used in the analysis;

(d) An explanation of why Sandler O'Neill did not calculate or disclose any implied per share values based on the proposed Merger.

95. With respect to Sandler O'Neill's "Net Present Value Analyses" for both PVF Capital and FNB, the Proxy Statement is deficient and should disclose the following:

(a) The projections and other forward-looking information (discussed above);

(b) The basis for using price to LTM earnings multiples of 8.0x to 18.0x and multiples of tangible book value of 50% to 175% to calculate terminal values for PVF Capital, particularly given that PVF Capital's multiples were higher than its peer companies' multiples;

(c) The basis for using price to LTM earnings multiples of 10.0x to 20.0x and multiples of tangible book value of 150% to 300% to calculate terminal values for FNB;

(d) The basis for selecting long-term growth rates of 10% and 6% for PVF Capital and FNB, respectively; and

(e) The basis for using the various discount rates used in this analysis, including the key inputs, especially considering that Sandler O'Neill used

different discount rate ranges when performing the analysis for PVF
Capital (10.0% to 16.0%) versus FNB (6.0% to 12.0%) (the Proxy
Statement discloses various inputs for PVF Capital but not for FNB).

96.    With respect to Sandler O'Neill's "Pro Forma Merger Analysis," the Proxy
Statement is deficient and should disclose the projected synergies expected to be realized from
the Merger, including those discussed with both PVF Capital and FNB's respective members of
management.

### The Process Leading Up to the Execution of the Merger Agreement

97.    The Proxy Statement fails to disclose critical information relating to the process
by which PVF Capital's management or the Board decided to pursue a strategic transaction and
obtain the highest possible price for the Company's shareholders.

98.    In particular, the Proxy Statement fails to disclose:

(a)    The Board's basis for determining on September 19, 2012 that an offer of
$3.50 per share would suffice for the Company to provide other entities
with confidential information about PVF Capital's business, including, but
not limited to, whether Sandler O'Neill performed any financial analyses
in this regard;

(b)    The outside firm which was retained to assist the Company in completing
its credit reviews;

(c)    When the credit reviews were completed;

(d)    Why the Board sought FNB's feelings about a possible transaction in
December 2012 in connection with deciding whether to contact other
potential merger partners;

(e)      What impact the termination of the Bank Order and Company Order had on the sales process;

(f)      The value of the indications of interest (in terms of exchange ratio and implied per share value) received throughout the process;

(g)      Why the Board (or Sandler O'Neill) decided to contact Bank B to gauge its interest in a potential transaction;

(h)      Why the Board (or Sandler O'Neill) decided not to pursue a transaction with Bank B notwithstanding that Bank B submitted a higher indication of interest than FNB and the Board (or Sandler O'Neill) had specifically selected Bank B as a potential merger partner; and

(i)      The dollar value of Bank B's indication of interest as of the date the Board decided to enter into the Merger Agreement.

99.     This information is material because it tells the Company's shareholders whether the proposed Merger is, in fact, the result of a process designed to secure the highest price possible for PVF Capital and its shareholders.

*Conflicts of Interest Affecting Sandler O'Neill*

100.    A financial advisor plays a crucial role in mergers and acquisitions, facilitating the mechanics of the sales process, providing expertise considering the suitability of combinations with certain parties, and ultimately rendering an opinion on the fairness of a deal.

101.    It is, therefore, important to retain an advisor that is both technically qualified and not subject to any conflicts of interest. It is equally important that any potential conflicts of interest must be disclosed to a company's shareholders so that they can assess the credibility of the work and analyses performed by the financial advisor.

102.     Here, however, the Proxy Statement omits material information concerning potential conflicts affecting Sandler O'Neill, which acted as the Board's financial advisor.

103.     The Proxy Statement states, "Sandler O'Neill has not received any fees for investment banking services from F.N.B. in the last 2 years." This misleads PVF Capital shareholders into believing that Sandler O'Neill has no conflicts of interest. The truth, however, is that Sandler O'Neill has earned millions of dollars from FNB over the years, having served as an underwriter and an advisor to FNB on numerous occasions.

104.     As indicated by a Form 424B2 prospectus that FNB filed with the SEC on June 11, 2011, Sandler O'Neill acted as a co-manager of FNB's public offering of 21,000,000 shares of common stock. The prospectus stated that Sandler O'Neill stood to earn a portion of $5,775,000 in underwriting commissions. As later reported, FNB actually sold an additional 3,150,000 shares of common stock pursuant to an over-allotment option—for a total of 24,150,000 shares—thereby increasing the amount of consideration that Sandler O'Neill earned from FNB.

105.     Sandler O'Neill also acted as FNB's financial advisor in connection with the company's 2008 acquisition of Iron & Glass Bancorp, Inc. In connection therewith, Sandler O'Neill earned substantial sums of money, although the exact amount of compensation it received is not disclosed.

106.     Sandler O'Neill now stands to earn approximately $1.3 million for serving as PVF Capital's financial advisor in connection with the Merger. Given that Sandler O'Neill has likely earned substantially more money from FNB over the past several years, this raises a serious question regarding Sandler O'Neill's loyalty to PVF Capital.

107.    The information revealing Sandler O'Neill's potential conflicts of interest is highly material and, as such, must be disclosed.

108.    The Proxy Statement fails to disclose additional information concerning the selection, retention, compensation, etc. of Sandler O'Neill, including, *inter alia*:

    (a)    The circumstances surrounding the retention of Sandler O'Neill and whether any other financial advisors were considered;

    (b)    The Board's versus management's role in retaining Sandler O'Neill;

    (c)    The extent to which Sandler O'Neill was representing BCSB Bancorp, Inc., which also recently agreed to merger with FNB, throughout the course of negotiations; and

    (d)    Whether the Board was aware of how much money Sandler O'Neill has received and still stands to receive from FNB.

*Conflicts of Interest Affecting the Company's Board and Members of Management*

109.    The Proxy Statement states that FNB has agreed to provide post-Merger arrangements with various members of PVF Capital's management, including Defendant King. However, the Proxy Statement fails to disclose various items concerning these individuals' potential conflicts of interest, including:

    (a)    When discussions concerning post-Merger opportunities first began between PVF Capital executives and FNB (including through their respective representatives);

    (b)    Whether any other potential strategic partners (including, for example, Bank B) indicated an interest or willingness to retain these individuals following a transaction like the Merger;

(c)  The financial details of any and all discussions, whether or not such terms have been formalized, agreed upon, or otherwise resolved; and

(d)  Whether the Board was privy to information concerning the post-Merger arrangements prior to voting to enter into the Merger Agreement.

110.  It is necessary for PVF Capital shareholders to be provided with this information concerning the financial interests of the Company's fiduciaries in order for shareholders to assess the credibility of the Board's recommendation and to evaluate whether the proposed Merger is, in fact, the result of a sound, arm's-length process.

### *The Departure of Former Board Member Marty E. Williams*

111.  The Proxy Statement also fails to disclose any information concerning the departure of one of the Board members almost immediately after entering into the Merger Agreement.

112.  Marty E. Adams had served as a director of PVF Capital since January 2010 and as a director of Park View Federal since September 2009.

113.  Mr. Adams had also served as PVF Capital's Interim CEO from March 2009 until September 9, 2009.

114.  In the most recent election cycle (last fall), Mr. Adams ran for reelection to the Board and, in fact, was elected to serve a two year term that would run through September 2014.

115.  However, on February 22, 2013, just days after the Company announced the proposed Merger, Marty E. Adams abruptly resigned from the Board effective on February 26, 2013.

116.     The Proxy Statement should disclose why Mr. Adams decided to resign, including whether his departure (whether voluntary or involuntary) was in any way related to the Merger or the process that led to the execution of the Merger Agreement.

117.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company shareholders will continue to suffer absent judicial intervention.

## CLAIMS FOR RELIEF

### COUNT I

**Against All Defendants for Violations of § 14(a) of the
Securities Exchange Act of 1934 and the SEC's Rule 14a-9**

118.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

119.     Defendants have issued the Proxy Statement with the intention of soliciting shareholder support for the Merger. Each of the Defendants reviewed and authorized the dissemination of the Proxy Statement which fails to provide critical information regarding, among other things, the future value of the Company, the key inputs and assumptions of the financial analyses, potential conflicts of interest, and the background leading up to the Merger.

120.     In so doing, the Defendants made untrue statements of fact and omitted to state material facts necessary to make the statements made not misleading. Each of the Director Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).

121.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that such communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or

misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

122.     Specifically, the Proxy Statement violates Section 14(a) and Rule 14a-9 because it omits material facts, including those set forth above. Moreover, in the exercise of reasonable care, Defendants knew or should have known that the Proxy Statement is materially misleading and omits material facts that are necessary to render it not misleading.

123.     The misrepresentations and omissions in the Proxy Statement are material to Plaintiff and the Class, who will be deprived of their entitlement to cast a fully informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Merger. As a direct and proximate result of Defendants' conduct, Plaintiff and other PVF Capital shareholders will be irreparably harmed.

124.     Plaintiff has no adequate remedy at law.

### COUNT II

### Against the Director Defendants for Violations of §20(a) of the 1934 Act

125.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

126.     The Director Defendants acted as controlling persons of PVF Capital within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of PVF Capital, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

127.    Each of the Director Defendants were provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

128.    In particular, each of the Director Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same. Projected financial information was reviewed by the Board periodically at meetings. The Proxy Statement at issue contains the unanimous recommendation of each of the Director Defendants to approve the Merger. They were, thus, directly involved in the making of this document.

129.    In addition, as the Proxy Statement sets forth at length, and as described herein, the Director Defendants were each involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy Statement purports to describe the various issues and information that the Director Defendants reviewed and considered. The Director Defendants participated in drafting and/or gave their input on the content of those descriptions.

130.    By virtue of the foregoing, the Director Defendants have violated Section 20(a) of the Exchange Act.

131.    As set forth above, the Director Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct

and proximate result of the Director Defendants' conduct, Plaintiff and the Class will be
irreparably harmed.

132.    Plaintiff has no adequate remedy at law.

## COUNT III

**Against the Director Defendants for Breach of Fiduciary Duty for
Inadequate or Misleading Disclosure in Connection with the Merger**

133.    Plaintiff repeats all previous allegations as if set forth in full herein.

134.    The fiduciary duties of the Board members in the circumstances of the proposed
Merger require them to disclose to Plaintiff and the Class all information material to the
decisions confronting PVF Capital's shareholders.

135.    As set forth above, the Board members have breached their fiduciary duty
through materially inadequate disclosures and material disclosure omissions.

136.    As a result, Plaintiff and the Class members are being harmed irreparably by
virtue of being unable to cast a fully informed vote on the Merger.

137.    Plaintiff and the Class have no adequate remedy at law.

## COUNT IV

**Against the Director Defendants for Breach of Fiduciary Duty for
Acting Unreasonably in Considering and Agreeing to the Merger**

138.    Plaintiff repeats all previous allegations as if set forth in full herein.

139.    The Director Defendants have knowingly and recklessly and in bad faith violated
fiduciary duties of care, loyalty, good faith, and independence owed to the public shareholders of
PVF Capital and have acted to put their personal interests ahead of the interests of PVF Capital
shareholders.

140.    The Director Defendants have breached their fiduciary duties of loyalty, good
faith, and independence owed to the shareholders of PVF Capital because, among other reasons:

(a)     they failed to take steps to maximize the value of PVF Capital to its public shareholders and took steps to avoid competitive bidding;

(b)     they acted in an uninformed and unreasonable manner;

(c)     they failed to properly value PVF Capital; and

(d)     they ignored or did not protect against the numerous conflicts of interest resulting from the directors' own interrelationships or connection with the Merger.

141.    As a result of the Director Defendants' breaches of their fiduciary duties, Plaintiff and the Class will be damaged.

142.    Unless enjoined by this Court, the Director Defendants will continue to breach their fiduciary duties owed to Plaintiff and the Class, and may consummate the Merger, to the irreparable harm of the Class.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants jointly and severally, as follows:

(A)     declaring this action to be a class action and certifying Plaintiff as the Class representative and her counsel as Class counsel;

(B)     enjoining, preliminarily and permanently, the Merger;

(C)     in the event that the transaction is consummated prior to the entry of this Court's final judgment, rescinding it or awarding Plaintiff and the Class rescissory damages;

(D)     directing that Defendants account to Plaintiff and the other members of the Class for all damages caused by them and account for all profits and any special benefits obtained as a result of their breaches of their fiduciary duties;

(E)     awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

(F)      granting Plaintiff and the other members of the Class such further relief as the Court deems just and proper.

Dated: July 24, 2013                        Respectfully submitted,

/s/ James B. Rosenthal
**COHEN ROSENTHAL & KRAMER, LLP**
Joshua R. Cohen (0032368)
jcohen@crklaw.com
James B. Rosenthal (0062872)
jbr@crklaw.com
The Hoyt Block Building
Suite 400
700 West St. Clair Avenue
Cleveland, Ohio 44113
Tel: (216) 781-7956
Fax: (216) 781-8061

**OF COUNSEL:**

**LEVI & KORSINSKY LLP**
Joseph E. Levi
W. Scott Holleman
30 Broad Street, 24th Floor
New York, New York 10004
Tel: (212) 363-7500
Fax: (212) 363-7171

## JURY DEMAND

Plaintiffs demand a trial by jury on all eligible claims, defenses and issues.

/s/ James B. Rosenthal
James B. Rosenthal (0062872)